```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------X
UNITED STATES OF AMERICA,      :
                               :    06 Cr. 601 (JFK)
        -against-              :
                               :    OPINION and ORDER
JUAN ERNESTO MERCEDES NAUT,    :
 a/k/a "Ernesto Mercedes,"     :
                               :
        Defendant.            :
------------------------------X
```

<u>APPEARANCES:</u>

<u>For the United States of America:</u>
        MICHAEL J. GARCIA
        United States Attorney for the
        Southern District of New York
        One St. Andrews Plaza
        New York, New York 10007
        Of Counsel: Michael D. Maimin
                    Celeste L. Koeleveld
                    Assistant United
                    States Attorneys


        <u>For the Defendant:</u>
        B. Alan Seidler, Esq.
        580 Broadway
        New York, New York 10012


**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

**BACKGROUND**

On July 18, 2006, Defendant Juan Ernesto Mercedes Naut ("Defendant", or "Naut") was indicted by a grand jury for one count of money laundering, in violation of 18 U.S.C. § 1956(h), and one count of illegal re-entry by an alien previously deported and previously convicted of an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and (b)(2).

By motion dated June 14, 2007, the defendant seeks an order from this Court suppressing "certain physical evidence seized from [the defendant] by law enforcement, and Dismissing the Indictment pursuant to Rule 12(b)(3)(C), of the Federal Rules of Criminal Procedure." (Notice of Motion at 1.) According to the accompanying affidavit, the defendant seeks to suppress "physical evidence seized, post arrest statements, and such other relief as is just." (Affidavit of Juan Mercedes Naut, sworn to on June 14, 2007[1] ("Naut Aff.") at 2). In his affidavit, the defendant does not contest the facial validity of the Indictment.

The Court held a suppression hearing on September 5, 2007 and permitted post-hearing briefing.

---

[1] The Naut Aff. purports to be sworn to on June 14, 2006. Because the notice of motion is dated June 14, 2007, and because the incident in question had not yet taken place on June 14, 2006, the Court assumes that this is a typographical error, and that the affidavit was actually sworn to on June 14, 2007.

*Factual Findings At The Hearing*

At the Suppression Hearing, the Government called as its witnesses three NYPD detectives who were involved in Naut's arrest:  Detectives Anthony Bonilla, Detective John Figueroa, and Detective Rafael Hernandez.  The witnesses testified as follows.

On June 29, 2006, a field team consisting of Detectives Bonilla, Figueroa and Hernandez, Lieutenant Sweeney, and other law enforcement officers was conducting surveillance of an apartment building located at 34 Hillside Avenue, New York, New York.  Detective Bonilla was dressed in plainclothes and stationed in an unmarked car parked on Hillside Avenue, opposite the building. (Tr. 7.)[2]  Shortly after 3:00 pm, Bonilla observed two men, who were later identified as Naut and Naut's nephew, Efrain Alicea, exit the building and hold a brief conversation in front of the building's entrance. (Tr. 8-9, 34.)  Alicea was carrying a gym bag on his shoulder.  The bag appeared to be heavily weighted and made of nylon material.  The outlines of rectangular objects were pressing against and visible through the bag's fabric. (Tr. 10-11, 36.)

Bonilla observed Naut and Alicea walk down Hillside Avenue in the direction of Broadway. (Tr. 12.)  Naut walked three to five feet behind Alicea. (Tr. 13.)  While walking, Naut looked

---

[2]References to "Tr." are to the pages of the transcript of the Suppression Hearing held on September 5, 2007.

around at passing vehicular and pedestrian traffic and at parked cars. (Tr. 12.)  Bonilla believed that Naut was conducting countersurveillance of the area in an attempt to detect the presence of police officers.  Based on his training and experience in investigating drug trafficking, Bonilla concluded that Naut's actions and the appearance of the gym bag carried by Alicea indicated that the bag contained "contraband," specifically "[d]rugs or U.S. currency." (Tr. 13.)

After Naut and Alicea passed Bonilla in his unmarked car, Bonilla radioed his field team to advise them of Naut's and Alicea's location and description.  Bonilla also advised the field team "that the bag looks good." (Tr. 14.)  Bonilla then left his car to follow Naut and Alicea on foot. (Tr. 14.)

Detective Figueroa, dressed in plainclothes and stationed in an unmarked car near the intersection of Hillside Avenue and Broadway, received Bonilla's initial radio transmission advising the field team of Naut's and Alicea's description and location. (Tr. 62-63.)  Figueroa observed Naut and Alicea walking west on Hillside Avenue toward the intersection of Broadway and Nagle Avenue.  Figueroa testified that the bag that Alicea carried appeared to be heavy and filled to capacity with square objects. (Tr. 64-65.)  According to Figueroa, Naut appeared to be protecting Alicea and "watching his back." (Tr. 67.)  Figueroa also testified that Naut was looking

-4-

around in a "countersurveillance manner" and that Alicea appeared
to be clutching the gym bag protectively.  From the actions of
Naut and Alicea, the appearance of the bag, and the "drug-prone"
nature of the neighborhood, Figueroa testified that, in his
training and experience, he believed the gym bag contained drugs
or drug proceeds. After observing Naut and Alicea turn right onto
Nagle Avenue, Figueroa left his car and followed them on foot.
(Tr. 68-69.)

        As Bonilla and Figueroa followed them, Naut and Alicea
continued on Nagle Avenue to a parking garage located at 31 Nagle
Avenue. (Tr. 15-17, 71.)  While following Naut and Alicea,
Bonilla advised his field team of Naut's and Alicea's location
via his Nextel cell phone. (Tr. 17.)  Bonilla testified that,
before entering the garage, Alicea handed Naut the gym bag.  (Tr.
18.) According to Figueroa, Alicea handed Naut the bag "[w]hen
they entered" the garage. (Tr. 72.) Bonilla advised the field
team, via cell phone, that Alicea and Naut had entered the
garage, and shortly thereafter Bonilla followed them inside. (Tr.
18, 47.)  Figueroa also followed Naut and Alicea into the garage.
(Tr. 71.)  After entering the garage, both Naut and Bonilla stood
near the garage's entrance, observing Naut and Alicea. (Tr. 73-
74.)

        Naut and Alicea approached the window of the parking
attendant's booth near the pay phone on the left wall of the

garage. (Tr. 19, 71.)  At this point, Naut was carrying the gym
bag.  Naut looked around the garage and appeared to notice both
Figueroa and Bonilla. (Tr. 20, 73.)  Bonilla pretended to be
speaking on his cell phone. (Tr. 20.)  After looking at Bonilla
and Figueroa, Naut dropped the duffel bag to the floor between
him and Alicea. (Tr. 20-21, 72.)  Figueroa and Bonilla then
approached Naut and Alicea. (Tr. 21, 73.) Figueroa and Bonilla
identified themselves as police officers, displayed their badges,
and asked Naut and Alicea if they could speak with them. (Tr. 21,
73-74, 77-78.)  According to Bonilla, Naut and Alicea said
nothing in response. (Tr. 22.)  According to Figueroa, Naut and
Alicea "agreed" to speak with the detectives. (Tr. 74.)

        Bonilla and Figueroa then asked Naut and Alicea if the
bag belonged to them. (Tr. 22-23, 74-75.)  Bonilla testified that
he posed the question "numerous times" in both Spanish and
English. (Tr. 22.)  Figueroa testified that he asked the question
once, in English, to both Alicea and Naut. (Tr. 75.) Naut and
Alicea denied owning the bag. (Tr. 22-23, 75.)  Detective
Hernandez, responding to Bonilla's cell phone transmission, then
entered the parking garage. (Tr. 104.)

        Bonilla and Figueroa then asked both Naut and Alicea if
they could look inside the bag. (Tr. 23, 75, 106.)  Bonilla and
Figueroa testified that both Naut and Alicea responded that the
bag did not belong to them and that Bonilla and Figueroa could

-6-

search the bag. (Tr. 23, 75-76.) Specifically, Bonilla testified
that he asked both Naut and Alicea, "that's your bag?" and that
he asked the question "numerous times" in both Spanish and
English. (Tr. 23.)  According to Bonilla, Naut said, "That's not
mine.  You can open it.  I don't care." (Tr. 23.)  When asked
what Alicea said, Bonilla testified, "He said it wasn't his bag.
He didn't care. . . . He said we could open it." (Tr. 23.)
Figueroa testified that he asked both Naut and Alicea, "Do you
mind if I look in your bag?"; that Alicea said, "No problem"; and
that Naut gave "[t]he same" response. (Tr. 75.) When asked
whether those were the exact words Alicea and Naut had spoken,
Figueroa testified, "Sum and substance." (Tr. 75-76.)  Hernandez
testified that, although he did not hear Naut respond to
Figueroa's question as to whether Figueroa could search the bag,
he saw Naut shrug. (Tr. 106.)

        The bag was then opened.  Bonilla and Figueroa did not
see who opened the bag, because they were focused on Naut and
Alicea. (Tr. 49, 76).  Bonilla testified, however, that he
believed the bag was opened by Lieutenant Sweeney, who had
entered the parking garage at some point after Figueroa and
Bonilla. (Tr. 24, 49.)  Figueroa testified that he did not know
who opened the bag. (Tr. 77.) Hernandez testified that he
observed Sweeney open the bag. (Tr. 107.)  Bonilla and Figueroa
testified that the bag was opened only after Naut and Alicea said

that the detectives could open it. (Tr. 23-24, 58-59, 76-77.)
Hernandez testified that Sweeney opened the bag only after
Figueroa asked Naut a question and Naut shrugged in response.
(Tr. 106.)

        Bonilla testified that his gun remained in its holster
at his waist but was "partly exposed" when he first approached
Naut and Alicea. (Tr. 21.)  Bonilla also testified that, prior to
the point at which the bag was opened, he did not recall
withdrawing his gun from its holster but did recall "having [his]
hand on [his] gun, holstered." (Tr. 26.)  Bonilla further
testified that he did not see Figueroa withdraw his gun from its
holster at any point prior to or during the search of the bag.
(Tr. 27.) Figueroa testified that his gun remained in his holster
at all times up to the search of the bag but that he had his hand
on the gun and the gun was showing. (Tr. 78.)  Bonilla did not
notice whether Hernandez or Sweeney pulled their guns from their
holsters because Bonilla was focused on Naut and Alicea. (Tr.
27.)  Figueroa testified that he did not see whether Bonilla,
Hernandez, or Sweeney drew their guns at any time in the garage.
(Tr. 77-78.)  Hernandez testified that neither he, Bonilla,
Figueroa, or Sweeney drew his gun at any point while Hernandez
was in the garage. (Tr. 107.)

        The gym bag contained U.S. currency in denominations of
twenty-, fifty-, and one hundred-dollar bills. (Tr. 25, 81-82,

108.)  After the bag was opened, both Naut and Alicea were searched, placed under arrest, read their <u>Miranda</u> rights, and were given <u>Miranda</u> waivers that they signed. (Tr. 27, 30-31, 79, 81-82.)  Naut subsequently stated that the bag contained $300,000, that he had received the currency the day before from an individual named "Gordo", and that the money came from "something illegal." (Tr. 31.) A search of Naut's wallet revealed pieces of paper on which were written "numbers and amounts", which Bonilla characterized as records of money laundering. (Tr. 31-32, 82.)

        The defense offered the testimony of a single witness, Efrain Alicea, Naut's nephew.  Alicea testified that, on the afternoon of June 29, 2006, he and Naut left his residence at 34 Hillside Avenue to go to the garage on Nagle Avenue where Alicea had parked his car in order for Alicea to drive Naut to an undetermined location. (Tr. 112-113.)  As Naut and Alicea left the building to go to the garage, Alicea was carrying on his shoulder a bag that belonged to his uncle.  Alicea testified that the bag was heavy and that he had offered to carry it because Naut was "an old man." (Tr. 114.)  Alicea testified that he did not ask Naut what was in the bag but that Alicea believed it contained clothes. (Tr. 114, 119.)  It was unclear from Alicea's testimony on cross-examination where or when Alicea first noticed his uncle in possession of the bag on June 29, 2006 or the

circumstances under which Alicea offered to carry the bag for
Naut.  Alicea testified that Naut was in Alicea's apartment at 34
Hillside Avenue when Alicea arrived home earlier in the afternoon
of June 29, 2006. (Tr. 130.)  Alicea could not say how Naut
entered the apartment.  Alicea also stated that he did not see
the bag when he arrived home and discovered Naut in his
apartment.  (Tr. 130.)  Alicea testified, first, that he did not
see the bag "[u]ntil we went outside,"; second, that he saw Naut
"in the building carrying the bag"; third, that when Alicea and
Naut were leaving Alicea's apartment, "I saw the bag with my
uncle and I picked it up"; and finally, that Alicea saw Naut "in
front of my door with the bag." (Tr. 131, 132, 133.)

        According to Alicea, as he and Naut walked from 34
Hillside Avenue to the parking garage, they spoke about sports
and other subjects and Naut was acting normally. (Tr. 115.) After
Alicea and Naut entered the parking garage, and Alicea gave his
parking ticket to an attendant, "three or four officers" emerged
from a Jeep Pathfinder and approached Alicea. (Tr. 116.)  One
officer approached Alicea "with a gun in his hand", pointed the
gun at Alicea's head, took Alicea "to the side", and asked Alicea
whether he had a gun.  (Tr. 116-17.) Alicea denied having a gun.
The officer then proceeded to ask Alicea other questions while
continuing to point the gun at his head. (Tr. 116, 118.)  When
asked who owned the bag, Alicea said that he did not know. (Tr.

-10-

118.)  Alicea testified that, apart from the officer who pointed the gun at Alicea's head, none of the other officers drew their guns. (Tr. 119, 121.)

Alicea testified that, when the officers approached him, the bag was on the floor, because Alicea had placed it there.  Alicea testified that, from the time he and Naut left 34 Hillside Avenue to the time Alicea placed the bag on the floor, Naut did not at any point carry the bag. (Tr. 117.)  While Alicea was being questioned by the officer, he could see Naut being questioned.  Alicea testified that he heard Naut being asked whether the bag belonged to him but did not hear Naut's response. (Tr. 118, 121.)  Alicea stated, "I don't know what they said, but they just opened up the bag and volunteered." (Tr. 118.) On cross-examination, when asked whether the officers had asked if they could look in the bag, Alicea stated, "No." (Tr. 121.) Alicia explained that "[t]he bag was on the floor and they just came from behind and opened it." (Tr. 121-22.)  Alicea also testified that, apart from the officer who pointed a gun at his head, no other officer pointed a gun at him or at Naut. (Tr. 119.)

After his arrest, Alicea and police officers went to Alicea's apartment at 34 Hillside Avenue, where Alicea gave his signed consent to a search. (Tr. 122, 125.)  As a result of the search of Alicea's apartment, police recovered drugs, a scale,

baggies, and rubber bands. (Tr. 124.)  Alicea testified that he was aware that the results of the search of his apartment could result in trouble for him and that Naut would also be in substantial trouble if the arrest of June 29, 2006 proved to be "legitimate". (Tr. 127.)  Alicea also answered affirmatively when asked whether he would do whatever he had to in order to portect Naut. (Tr. 126-27.)

Although Naut did not testify at the suppression hearing, Naut's affidavit, submitted in connection with the instant motion, recounted his version of the events leading up to the search of the bag.  According to Naut's affidavit, Naut was carrying a "backpack" while walking with his nephew on a "public street" and placed the bag on the sidewalk. (Naut Aff. ¶ 3.)  At that point, four police officers approached, all with their guns drawn and pointed at both Naut and his nephew.  One officer pointed his gun at Naut's nephew's head, while another asked Naut, "where is the pistol." (Id.)  The officers then searched the backpack without asking for or receiving permission to do so. (Id.)

## DISCUSSION

Defendant moves to suppress the physical evidence and evidence of post-arrest statements that were obtained as a result of the police's search of the gym bag.  Defendant also moves to dismiss the Indictment.

-12-

*(a) Suppression of Evidence*

The Government argues that the search of the gym bag was legal, on the ground that the bag was abandoned, or, alternatively, that Naut gave his consent to the search of the bag. The Government also argues that the detectives' questioning of Naut and Alicea, which led to the purported acts of abandonment or consent, constituted a permissible brief investigative detention. The defense contends that the warrantless search of the bag occurred without consent and that Naut's conduct did not supply the detectives with sufficient reason for the detectives to stop and detain Naut. The defense does not address the issue of whether the bag was abandoned.

*The Terry Stop*

Before considering whether the bag was abandoned prior to the search or Naut gave consent to the search, the Court first must determine whether Bonilla's and Figueroa's initial questioning of Naut and Alicea, which arguably resulted in the purported acts of abandonment or consent, constituted a permissible investigative detention.

The Court of Appeals has explained that

> There are three levels of interaction between agents of the government and private citizens. Consensual encounters require no justification so long as the police do not convey a message that compliance with their requests is required. Investigative detentions, the second category, require reasonable suspicion to believe that criminal activity has occurred or is about to occur. Arrests, requiring a showing of probable cause, comprise

the third type of encounter between citizens and
government agents.
United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (internal
quotations and citations omitted).  The Government contends that
the interaction between the detectives and Naut and Alicea
constituted a permissible investigative detention, which is the
second level of interaction, commonly known as a Terry stop.  The
defense maintains that "there was no reasonable suspicion of
defendant's activities to warrant a Terry stop; nor was a Terry
stop ever conducted." (Def. Mem. at 1.)

Under Terry v. Ohio, 392 U.S. 1 (1968) and its progeny,
an investigating officer may briefly detain an individual for
questioning if the officer has "a reasonable suspicion supported
by articulable facts that criminal activity 'may be afoot.'"
United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry,
392 U.S. at 30).  Such a limited detention does not violate the
Fourth Amendment, even though probable cause for an arrest may be
lacking. See Sokolow, 490 U.S. at 7.  Reasonable suspicion
requires that the officers be aware of "specific articulable
facts" that, together with rational inferences from those facts,
"reasonably warrant suspicion" that the individual was engaging
in or was about to become engaged in criminal activity. United
States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975).  The Fourth
Amendment requires "some minimal level of objective
justification" for making the stop. INS v. Delgado, 466 U.S. 210,

216-17 (1984).

        In determining whether an officer possesses reasonable suspicion, the Court must look "not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experiences." United States v. Bold, 19 F.3d 99, 102 (2d Cir. 1994) (quoting Terry, 392 U.S. at 22).  A court must examine whether "the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate." Terry, 392 U.S. at 21-22 (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)).  The requisite degree of suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Glover, 957 F.2d 1004, 1009 (2d Cir. 1992) (citations and internal quotations omitted).  The Court must scrutinize the totality of circumstances to determine whether an investigatory stop passes constitutional muster. See United States v. Salazar, 945 F.2d 47, 50 (2d Cir. 1991).  The Government has the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop. United States v. Perea, 986 F.2d 633, 644-45 (2d Cir. 1993).

        Here, Bonilla's and Figueroa's brief questioning of Naut and Alicea stemmed from the detectives' objectively reasonable belief that Naut and Alicea were transporting drugs or

drug proceeds.  As the detectives credibly testified, Naut
appeared to be conducting countersurveillance during the walk
from Alicea's apartment building to the parking garage, as he
looked around frequently at pedestrians and at moving and parked
cars, and appeared to be guarding Alicea's back.  The bag that
Alicea carried and clutched protectively appeared heavily
weighted and filled with rectangular objects, the outlines of
which were visible through the bag's fabric, and the dimensions
of which were consistent with the size and shape of stacks of
currency.  In addition, as Figueroa testified, the neighborhood
had a reputation for drug activity.  The detectives had ample
training and experience to lead them to suspect, based on their
observations, that the gym bag contained drugs or drug proceeds:
Bonilla and Figueroa are both 17-year veterans of the police
department who have received training in narcotics and money
laundering investigations and have participated in hundreds of
such investigations and arrests. (Tr. 4, 61.)  The detectives'
observations, in light of their considerable experience, provided
ample grounds for their reasonable suspicion that Alicea and Naut
were carrying contraband, in the form of either drugs or drug
money. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000)
("Nervous, evasive behavior is a pertinent factor in determining
reasonable suspicion."); United States v. Garcia, 339 F.3d 116,
119 (2d Cir. 2003) (upholding trial court's finding that officers

had reasonable suspicion where defendants were seen engaging in countersurveillance in a known drug-trafficking area and carrying a plastic bag containing rectangular package); United States v. Alexander, 907 F.2d 269, 271 (2d Cir. 1990) (holding that reasonable suspicion existed where defendants parked their car in a neighborhood with frequent drug activity, left and returned minutes later with a brown paper bag, then drove away quickly).

Alicea's testimony at the Suppression Hearing and Naut's affidavit do not counsel a different conclusion. Alicea testified that, during the walk from his apartment on Hillside Avenue to the parking garage on Nagle Avenue, he and Naut were engaged in ordinary discussions, Naut was not conducting countersurveillance, and that Naut was acting normally. Alicea's characterization of his and Naut's behavior as normal, even if credited, does not negate the detectives' observations regarding the appearance of the gym bag or their knowledge of the drug-prone nature of the neighborhood, which were important factors in leading the detectives to formulate a reasonable suspicion about ongoing criminal activity. Further, I find that Alicea's testimony must be rejected as non-credible and self-serving. As the Government points out, Alicea's testimony was frequently confused and rife with contradictions. For example, Alicea provided four different versions of when and where he first saw the gym back and took the bag from Naut. Alicea also

-17-

testified that he did not consent to the search of his apartment but then conceded that he had signed the consent form.  In addition, as the Government correctly notes, Alicea had two strong motivations to provide false testimony at the suppression hearing.  First, as Alicea conceded, he would do whatever was needed in order to protect his uncle, Naut.  Second, the post-arrest search of Alicea's apartment yielded drugs and drug paraphernalia.  Thus, Alicea stands to benefit from the suppression of the search of the gym bag, which in turn led to his and Naut's arrest and the subsequent consent search of Alicea's apartment. Accordingly, I give very little weight to Alicea's version of the facts.

Naut's short affidavit does not contain any statements relating to the appearance of the gym bag, Naut's or Alicea's conduct as the two walked to the garage, or any of the other factors that led the detectives to believe that the gym bag contained contraband.  Thus, Defendant's affidavit, in addition to being entirely inconsistent with the testimony of the Government's witnesses and even with Alicea's testimony, is entitled to no weight in the Court's determination of whether Bonilla and Figueroa conducted a permissible investigative detention of Naut and Alicea.

In sum, I credit the testimony of Figueroa and Bonilla, and find that the detectives' initial interaction with Naut and

Alicea, during which Bonilla and Figueroa identified themselves as police officers and asked questions regarding the ownership of the gym bag, was justified by a reasonable suspicion of criminal activity.

Further, the detectives' encounter with Alicea and Naut was minimally intrusive.  Although Bonilla and Figueroa identified themselves as police, displayed their badges, and revealed their holstered guns, the encounter consisted only of a few brief questions and no physical interaction.  Thus, the detectives' interaction with Alicea and Naut was "reasonably related in scope and duration to the circumstances that justified the stop in the first instance, so as to be minimally intrusive of [Naut's] Fourth Amendment interests." Glover, 957 F.2d at 1011.  Although Alicea testified that an officer questioned him while holding a gun to his head, this testimony is contradicted by the testimony of all three of the Government's witnesses, each of whom testified that he did not draw his gun at any point in the parking garage and that he did not observe any other officer draw his gun.  In addition, as noted above, I reject Alicea's version of events because his testimony was non-credible and self-serving.

In sum, I find that the encounter between Bonilla and Figueroa and Naut and Alicea constituted a permissible investigative detention that did not violate Naut's Fourth

Amendment rights.

*Abandonment*

Having concluded that it was permissible for the detectives to conduct the questioning that led to the purported abandonment of the bag, the Court next must determine whether the gym bag in fact was abandoned prior to the search.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.  Warrantless searches of dwellings or personal effects are "per se unreasonable" under the Fourth Amendment unless a judicially recognized exception applies. See e.g., Mincey v. Arizona, 437 U.S. 385, 390 (1978); United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990).  The Government bears the burden of proving by a preponderance of the evidence that its departure from the warrant requirement was legally justified. See Arkansas v. Sanders, 442 U.S. 753, 759-60 (1979).

One well-recognized exception to the Fourth Amendment's warrant requirement applies to property that has been abandoned prior to a search.  It is well established that a warrantless seizure of abandoned property does not violate the Fourth Amendment because the act of abandonment constitutes a forfeiture of any reasonable expectation of privacy in the property. See United States v. Springer, 946 F.2d 1012, 1017 (2d Cir. 1991)

-20-

(citing inter alia <u>Abel v. United States</u>, 362 U.S. 217, 241
(1960)); <u>United States v. Moskowitz</u>, 883 F.2d 1142, 1147 (2d Cir.
1989).  "[O]nce an item has been abandoned, the police do not
require probable cause to search it." <u>United States v. Bass</u>, No.
95 Cr. 672 (AGS), 1996 U.S. Dist. LEXIS 827, at *11 (S.D.N.Y.
Jan. 26, 1996) (citing <u>United States v. Thomas</u>, 864 F.2d 843, 847
(D.C. Cir. 1989)).  To determine whether property has been
abandoned, a court must focus on the intent of the person who is
alleged to have abandoned the property. <u>United States v. Lee</u>, 916
F.2d 814, 818 (2d Cir. 1990).  "Intent may be inferred from words
spoken, acts done, and other objective facts." <u>Id.</u> (internal
quotation marks and citation omitted).  "Abandonment is a
question of fact, to be decided in objective terms on the basis
of all the relevant facts and circumstances, and not on the basis
of leasehold interests or other property rights." <u>United States
v. Levasseur</u>, 816 F.2d 37, 44 (2d Cir. 1987).

Here, Detectives Bonilla and Figueroa credibly
testified that Naut, after carrying the bag inside the parking
garage at 31 Nagle Avenue, dropped the bag to the floor in front
of him, between where he and Alicea were standing, after Naut
noticed both Figueroa and Bonilla standing near the entrance of
the garage.  The detectives further testified that, after they
approached Naut and Alicea, the detectives identified themselves
as police officers and asked both Naut and Alicea whether the bag

that Naut had just dropped belonged to either of them, and that
both Naut and Alicea denied owning the bag.  Finally, the
detectives' testimony established that both Naut and Alicea, when
asked whether the detectives could look inside the bag, again
denied ownership and said that the detectives were free to open
the bag.  Specifically, as Bonilla credibly testified, Naut said,
"That's not mine.  You can open it.  I don't care," and Alicea
said substantially the same thing. (Tr. 23.)  In sum, the
testimony of the Government's witnesses established that Naut
dropped the bag and that both Naut and Alicea unequivocally
disclaimed ownership.  Naut's and Alicea's intent to abandon the
gym bag thus may be inferred from their words and actions. See
Lee, 916 F.2d at 818 (defendant's "unequivocal disclaimers" that
luggage did not belong to him justified court in finding that
defendant had abandoned luggage); United States v. Medina, 301 F.
Supp. 2d 322, 331 (S.D.N.Y. 2004) (by denying ownership of bag or
knowledge of bag's contents, defendants "made clear their intent
to distance themselves from the bag and to abandon whatever
interest they had in it").

        It is worth noting that, even under Alicea's version of
the facts, both Naut and Alicea may be deemed to have abandoned
the gym bag.  Alicea testified that he did not hear any of the
conversation that transpired between the detectives and Naut, and
that when an officer asked Alicea whom the bag belonged to,

Alicea responded that he did not know.  Thus, Alicea's version of events, even if credited, does not controvert the detectives' testimony that both Alicea and Naut denied knowing who owned the bag.

Because Naut and Alicea displayed an intent to abandon the gym bag prior to the search of the bag, Naut has no expectation of privacy in the gym bag and, accordingly, has no right to challenge the search of the bag as violative of the Fourth Amendment.

*Consent*

Having determined that the warrantless search of the gym bag was justified because the bag was abandoned prior to the search, the Court need not linger overlong on whether Naut gave consent for the search of the bag.  The Government provided more than sufficient evidence to show that, even if Naut and Alicea were deemed not to have abandoned the gym bag, they voluntarily consented to the search.  A search does not violate the Fourth Amendment if it is conducted pursuant to uncoerced consent.  See United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).  In determining whether a subject has given valid consent, "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  Id. at 423.

The detectives clearly had a valid basis for believing that Naut and Alicea gave their consent to the search of the gym bag.  According to the credible testimony of both Bonilla and Figueroa, the detectives asked Naut and Alicea whether they could look inside the gym bag.  Naut and Alicea both clearly responded in the affirmative.  As Bonilla, Figueroa, and Hernandez all testified, the bag was not opened until the detectives had asked for and received Naut and Alicea's consent.  Although Alicea testified that no consent was given, as stated above, Alicea's account must be rejected as non-credible.  Thus, Naut's and Alicea's consent to the search of the bag provides a valid alternative ground on which the search is justified.

*(b) Dismissal of the Indictment*

Defendant has asserted no valid ground for dismissal of the Indictment.  As the Government points out, the defense has not alleged that the Indictment is defective on its face.  To the extent that Defendant implies that suppression of evidence, as sought by the instant motion, should lead to dismissal of the Indictment, the Court has denied the motion to suppress in its entirety.  In any event, even if the Court had granted Defendant's motion, suppression of evidence does not constitute a valid ground for dismissal of an indictment that is valid on its face.  See United States v. Eichman, 756 F. Supp. 143, 145-46 (S.D.N.Y. 1991) (an indictment, if valid on its face "is

-24-

impervious to attack on a motion to dismiss"). Defendant's motion to dismiss the Indictment must be denied.

### CONCLUSION

For the foregoing reasons, Defendant's motion is DENIED in its entirety.

**SO ORDERED**
**October** *19*, 2007

John F. Keenan
**John F. Keenan**
**United States District Judge**

-25-